been reached before receipt of the telegram. Raisuli was ready at last to return his captives. Mounted on a "great, grey charger," he personally escorted Perdicaris and Varley on the ride down from the mountains, pointing out on the way the admirable effect of pink and violet shadows cast by the rising sun on the rocks. They met the ransom party, with thirty pack mules bearing boxes of Spanish silver dollars, halfway down. Payment was made and prisoners exchanged, and Perdicaris took leave, as he afterward wrote, of "one of the most interesting and kindly-hearted native gentlemen" he had ever known, whose "singular gentleness and courtesy . . . quite endeared him to us." At nightfall, as he rode into Tangier and saw the signal lights of the American warships twinkling the news of his release, Perdicaris was overcome with patriotic emotion at "such proof of his country's solicitude for its citizens and for the honor of its flag!" Few indeed are the Americans, he wrote to Gummere in a masterpiece of understatement, "who can have appreciated as keenly as I did then what the presence of our Flag in foreign waters meant at such a moment and in such circumstances."

Only afterward, when it was all over, did the State Department inform Gummere how keen indeed was Perdicaris' cause for appreciation. "Overwhelmed with amazement" and highly indignant, Gummere extracted from Perdicaris a full, written confession of his forty-year-old secret. He admitted that he had never in ensuing years taken steps to resume American citizenship because, as he ingenuously explained, having been born an American, he disliked the idea of having to become naturalized, and so, "I continued to consider myself an American citizen." Since Perdicaris perfectly understood that the American government was in no position to take action against him, his letter made no great pretension of remorse.

Perdicaris retired to England for his remaining years. Raisuli duly became governor of the Tangier districts in place of the falsehearted Bashaw. The French, in view of recent disorders, acquired the right to police Morocco (provoking the Kaiser's notorious descent upon Tangier). The Sultan, weakened and humiliated by Raisuli's triumph, was shortly dethroned by a brother. Gummere was officially congratulated and subsequently appointed minister to Morocco and American delegate to the Algeciras Conference. Sir Arthur Nicolson took "a long leave of abesnce," the Wazan brothers received handsomely decorated Winchester rifles with suitable inscriptions from Mr. Roosevelt, Hay received the Grand Cross of the Legion of Honor, and Roosevelt was elected in November by the largest popular majority ever before given to a presidential candidate.

"As to Paregoric or is it Pericarditis," wrote Hay to Assistant Secretary Adee on September 3, "it is a bad business. We must keep it excessively confidential for the present." They succeeded. Officials in the know held their breath during the campaign, but no hint leaked out either then or during the remaining year of Hay's lifetime or during Roosevelt's lifetime. As a result of the episode, Roosevelt's administration proposed a new citizenship law which was introduced in Congress in 1905 and enacted in 1907, but the name of the errant gentleman who inspired it was never mentioned during the debates. The truth about Perdicaris remained unknown to the public until 1933, when Tyler Dennett gave it away—in one paragraph in his biography of John Hay.

(NOTE.—Barbara W. Tuchman, the wife of a New York City physician, contributes to several journals of opinion and is the author of three books, the most recent being The Zimmermann Telegram, published last year by the Viking Press.)

Mr. CLARK. Mr. President, I suggest the absence of a quorum.

The PRESIDING OFFICER. The clerk will call the roll.

The bill clerk proceeded to call the roll.

Mr. TALMADGE. Mr. President, I ask unanimous consent that the order for the quorum call be rescinded.

The PRESIDING OFFICER. Without objection, it is so ordered.

INTERFERENCE WITH CIVIL RIGHTS

The Senate resumed the consideration of the bill (H.R. 2516) to prescribe penalties for certain acts of violence or intimidation, and for other purposes.

Mr. TALMADGE. Mr. President, earlier in the day I referred to Andrew Johnson's veto message on similar force legislation immediately following the War Between the States. I call attention to some of his remarks that I find especially appropriate relating to this particular pending measure.

Referring to the rights of individual States under the Constitution to make, amend, and execute their own laws, President Andrew Johnson said:

> They certainly have not succeeded in preventing the commission of all crimes, nor has that been accomplished anywhere in the world. There, as well as elsewhere, offenders sometimes escape for want of vigorous prosecution, and occasionally perhaps by the inefficiency of courts or the prejudice of jurors.

Mr. LONG of Louisiana. Mr. President, will the Senator yield?

Mr. TALMADGE. I yield to my friend from Louisiana, the distinguished majority whip.

Mr. LONG of Louisiana. Mr. President, I ask the Senator from Georgia whether he agrees with me that this particular message is one of the most courageous statements ever made by an official in the public service of this country.

Mr. TALMADGE. I could not agree more. As a matter of fact, it almost obtained his impeachment, as the aftermath of the venom, the fury, and the hatred of the country generally toward the people of the Southern States.

We are living in somewhat the same kind of era at the present time, but, thank God, it is not as bad.

Mr. LONG of Louisiana. I ask the Senator if it is not true that after Andrew Johnson was impeached by the House of Representatives—in large measure because he had the courage to veto that reconstruction act—and went back to his home State of Tennessee, was subsequently elected Senator, from Tennessee, and returned, that was the first time in history of the Senate that, contrary to the rules, the Senate gave a Senator a standing ovation when he came in to take his oath.

Mr. TALMADGE. That is true. I call the attention of the Senator to the fact that the late President Kennedy selected Andrew Johnson as the subject of one of the articles for his book "Profiles in Courage."

Mr. LONG of Louisiana. I think it may safely be said that there was a man who, in effect, committed political suicide by standing up for what he considered right.

Mr. TALMADGE. I agree. Would that we had more examples today of that type of political courage.

President Andrew Johnson pointed out that this, of course, could be said of any part of the world or any part of the country, but to try to correct these ills by force legislation of the type now before the Senate is just as bad as the problems the legislation is attempting to remedy.

On the question of whether or not such force legislation is prohibited by the Constitution, or whether Congress can enact such a law, President Andrew Johnson said this:

> We have no right to do, in one place more than another, that which the Constitution says we shall not do at all.

I wish to emphasize and reiterate those words of President Andrew Johnson:

> We have no right to do in one place more than another, that which the Constitution says we shall not do at all.

I submit, Mr. President, that we have no right to enact a special law for the protection of special people in carefully selected States of the Union. We do not have the right to enact special laws anywhere, at any time.

Mr. President, I find President Andrew Johnson's veto message appropriate in many respects to what we are faced with today.

Mr. LONG of Louisiana. Mr. President, will the Senator yield at that point?

Mr. TALMADGE. I am delighted to yield to the Senator from Louisiana.

Mr. LONG of Louisiana. Mr. President, I ask the Senator from Georgia whether it is not correct that if there is one thing more than any other that, domestically, the people of this country want us to do, it is to pass a law to protect the civil rights of 200 million Americans, be they Negro or be they white, no matter what their color may be; that the people want us to pass a law—or to have a constitutional amendment, if need be—to do something to keep people like Stokely Carmichael and Rap Brown from going around accusing all the American people of being a bunch of murderers and assassins, which we are not, accusing us of being international criminals, which we are not, stirring up people to commit acts of violence against the laws of their States and their cities, and setting those mobs off to do the mischief that we find such great difficulty in restraining.

I further ask the Senator whether he knows of anything in this proposed bill that would do anything to stop people like Rap Brown and Stokely Carmichael from doing those awful things they have been doing up to now?

Mr. TALMADGE. No. On the contrary, the bill reads as if it might have been drafted either by them or by some of their legal department. I will point out to the Senator why. On page 7, under section 245. Interference with civil rights, at line 3, it reads:

> Whoever, whether or not acting under color of law.

That means that the police department of every municipality, the sheriff's office of every county of every State in the

Union, the State militias of all of the 50 States, and the Armed Forces of the U.S. Government, might be called out by the legally constituted authority, which can be the mayor, the chief of police, the sheriff of the county, the governor of the State, or the President of the United States.

Then, if those law enforcement officers proceed to try to put down a mob by force of arms and some citizen is shot down on a public street or sidewalk, the pending measure, if it is enacted into law, would immediately come into play. And if there is a diversity of race or religion between one of the rioters and a law enforcement officer or a sheriff's deputy or a member of the State militia, the U.S. Army, Marine Corps, Air Corps, or Navy, the law would immediately come into play.

Of course, as the Senator knows, if one of the rioters were to get hit with a rifle butt and a little blood were drawn, the man who wields the rifle butt would be subject to imprisonment for 10 years and a fine of $10,000.

The pending measure is designed not to stop Stokely Carmichael or Rap Brown or any rioter, but it will aid the rioters. It will throw a further damper on law enforcement officers who are already complaining as the Senator knows.

Some of the people in Detroit are hollering "police brutality." They did the same thing in Newark and in other areas. Instead of yelling "police brutality," all they would have to do under the pending measure would be to indict the police officer, prosecute him, and convict him when all he was doing was enforcing the law and trying to put down a riot.

Mr. LONG of Louisiana. Mr. President, did the Senator read some of the news reports about the event that happened in Louisiana last year when a group announced that they were going to march from Bogalusa to the State capital at Baton Rouge?

Mr. TALMADGE. I did.

Mr. LONG of Louisiana. Is the Senator aware of the fact that the Governor announced that he was going to protect the rights of these people and see that nobody disturbed or hurt them?

Mr. TALMADGE. I am.

Mr. LONG of Louisiana. The Governor called out the State police and the militia in order to protect them, even though white men had to fight white men to protect the marchers.

The Governor announced that when they reached the State capitol and were accorded the right of speaking from the capitol steps, if Rap Brown or Stokely Carmichael or one of that group said anything to incite those people to start shooting, burning, or destroying public property or deny somebody his civil rights, he was going to personally arrest him. He also said that he was going to have the State police and the militia arrest the whole gang. That is how that matter was broken up.

Under the pending measure, if the Governor had walked in and arrested a fellow the moment he got the crowd riled up to burn down the city, would not every officer and State police or even the National Guard or members of the U.S. Army who might help in the arrest be subject to imprisonment for 10 years and a fine of $10,000 if the court were to rule that they acted too soon?

Mr. TALMADGE. The Senator is correct. Page 7, section 245, reads:

... knowingly injures, intimidates, or interferes with ...

It could be stated that the Governor of Louisiana when he made that statement intimidated Stokely Carmichael or Rap Brown. The language also says, "or interferes with." Certainly the Governor of Louisiana interfered with Stokely Carmichael and Rap Brown when he stated he was going to arrest them if they incited people to riot and shoot other people.

The Senator from Louisiana is an able lawyer. I do not know what intimidate means in this bill. Some people say that Senators have been intimidated by Presidents concerning the way in which they vote. If the pending measure becomes law, perhaps the President will be subject to some penalty for intimidating Senators or Representatives.

No President has ever tried to intimidate the Senator from Georgia. However, I have heard it charged and alleged on many occasions that Members of Congress have been intimidated or coerced and that sometimes their arms have been twisted.

If the pending measure becomes law, it might even reach the President. I do not know what "interferes with" means in this bill.

I have been interfered with a lot of times. I never did think, however, that someone's interference was particularly a ground for trying to put him in jail if he did not happen to have the same color or religion or national origin that I have.

When I was speaking earlier in the day, the distinguished Senator from South Dakota [Mr. McGOVERN] and one of the clerks were standing in the doorway. If I had walked out of the door of the Senate Chamber, they would have been interfering with my exit. And if I had moved in and pushed them aside, I would have been interfering with their standing in the Senate Chamber doorway. Perhaps the measure would even affect Senators.

Mr. LONG of Louisiana. Could it not be contended that merely because a Senator takes the floor of the Senate and makes a speech, he is interfering with the civil right of some other Senator who wants to vote and get on with the matter and does not want to hear another speech?

Mr. TALMADGE. The Senator is correct. Sometimes we have had a row on the floor of the Senate when several Senators have addressed the Presiding Officer at the same time and the Presiding Officer, in the exercise of his duty and responsibility under the Senate rules and under the Constitution, recognized a particular Senator. I have seen acrimony on the floor of the Senate. Some Senator would contend that he should have been recognized rather than the Senator that the Presiding Officer recognized.

Those Senators were interfered with and they demonstrated it, sometimes rather violently, on the floor of the Senate.

Mr. LONG of Louisiana. Has not the Senator had the experience of being the Governor of his great State of Georgia?

Mr. TALMADGE. I have had that honor.

Mr. LONG of Louisiana. And it has been on more than one occasion.

Mr. TALMADGE. The Senator is correct, in two terms.

Mr. LONG of Louisiana. If the Senator from Georgia were serving in his old capacity as Governor of the State of Georgia, he would be the chief law enforcement officer of that State.

Mr. TALMADGE. I would and was.

Mr. LONG of Louisiana. Assuming that these people started to stir up trouble and the Governor foresaw the prospect of a riot and the danger of the great city of Atlanta being burned, I assume that the Governor would call out the National Guard, since they would be under his jurisdiction.

Mr. TALMADGE. The Senator is correct.

Mr. LONG of Louisiana. If the Governor would tell them to go out and put down the riot, is it not correct that the pending measure would provide that even though those men are soldiers and operating under the orders of their Governor, they would not be protected if they interfered with Rap Brown?

Mr. TALMADGE. Not only if they interfered with Rap Brown, but if they hit Rap Brown with an open hand while he was causing people to riot and drew a little blood, they could be sent to jail for 10 years and fined $10,000.

Mr. LONG of Louisiana. Those boys are not lawyers and do not understand the law.

Mr. TALMADGE. The Senator is correct. They could even be court martialed if they did not obey the order. They could be sent to the Federal penitentiary if they do obey the order. The pending measure would place them in a strange predicament.

Mr. LONG of Louisiana. Mr. President, does the Senator think it is fair to state to a fellow who is trying to do his duty and do what is right as the good Lord gave him the ability to do so, that he should do a certain thing, even though that he will be in trouble if he does it and he will be in trouble if he does not.

Mr. TALMADGE. I do not think it is fair at all.

Mr. LONG of Louisiana. If some young fellow joins the police force and tries to do his duty and obeys the orders of his superior, he can go to jail for 10 years and be fined $10,000 for doing so.

Mr. TALMADGE. The Senator is correct. The firemen in Detroit were doing their duty, and some of them were shot down while they were trying to put out fires that arsonists had set.

The firemen would not be protected at all under the pending measure, but the rioters would be protected.

Mr. LONG of Louisiana. If a fireman in trying to put out a fire erroneously grabs hold of the wrong person, thinking that one man had set the fire, would he not be subject to imprisonment for 10 years and a fine of $10,000 because he was trying to obey his orders?

Mr. TALMADGE. Provided he is of a

*February 1, 1968*  CONGRESSIONAL RECORD — SENATE  1819

different color, different religion, and different national origin. Presumably if both of them were Baptists, the law would not be applicable. However, if one were a Methodist and another were a Presbyterian, the law would come into play.

If one was white and the other was yellow or black, the law would come into play.

If one was born in Great Britain and the other was born in America, the law would come into play. However, if all parties involved were of the same race, religion, and national origin, the law would not come into play.

Mr. LONG of Louisiana. Does not the law have something to do with public officials seeking to guarantee equal protection under the law in the event someone interferes with him, even though there is no difference in race or religion or national origin.

Would that not provide for a situation in which, even though there is no difference in race, some poor fellow trying to do his duty under law could again be imperiled and be required to act without any protection of law, and subject to the severe penalties provided under this bill.

Mr. TALMADGE. I agree with the Senator.

I thank the Senator from Louisiana for his contribution in demonstrating to the Senate, and I hope to the country, the inequities of this bill.

Mr. President, I have previously stated the principal features that are wrong with this bill. First, it seeks to create a new Federal criminal code relating to matters that are already punishable by municipal ordinances and by State authority, and to create a far-reaching Federal criminal code which would create vague, new, indefinite crimes.

What constitutes the crime of "intimidates"?

What constitutes the crime of "interferes with or attempts to injure"?

Those terms, Mr. President, are so vague and so indefinite that no court, no grand jury, no prosecuting attorney, no sheriff, no law enforcement officer under the sun could determine their significance. Yet, that would be a part of the criminal code of our country.

Mr. LONG of Louisiana. Is the Senator aware of any other well-known law which makes it a crime to interfere?

Mr. TALMADGE. I have never heard of it. It does not even say what one is interfering with or how he is going to interfere.

Mr. LONG of Louisiana. Is it not possible that almost anything could be regarded as an interference?

Mr. TALMADGE. Back in my more youthful days, two boys would sometimes be courting the same young lady, and one of them would try to court her to the exclusion of the other. He was certainly interfering with the other boy's right to court that lady, and I would not want to make it a Federal crime.

Mr. LONG of Louisiana. If the race issue became involved, is it not possible that some person might be subject to prosecution and found guilty, under the law, merely because he was in love with the girl and somebody of a different race was in love with her?

Mr. TALMADGE. Exactly—and he tried to interfere.

Mr. LONG of Louisiana. Tried to marry her.

Mr. TALMADGE. That is correct.

Mr. LONG of Louisiana. Proposed that she should join him in wedlock.

Mr. TALMADGE. The Senator is eminently correct.

Mr. LONG of Louisiana. Can the Senator state with certainty that that would not be interference with that man's right to equal protection under the law?

Mr. TALMADGE. In terms of this bill, it probably would, and it would cause him to be subject to prosecution. If they got into a fistfight and a little blood was drawn, he could be sent to the penitentiary for 10 years and fined $10,000.

Mr. LONG of Louisiana. Mr. President, it occurs to me that when one thinks in terms of breach of promise, that has been regarded as an appropriate court action in some cases, and that might become involved in this situation.

For example, let us say a young lady is being courted by someone of a different religion or a different race, and the parents of that young lady do not want her to marry someone of a different religion or a different race, as the case may be, and they try to persuade the young lady not to marry him but to marry someone of her own religion.

Mr. TALMADGE. Under those conditions, they would be staring the Federal penitentiary squarely in the eye.

Mr. LONG of Louisiana. Does the Senator believe that anybody in this country has any idea that situations such as that may be involved in this bill?

Mr. TALMADGE. I do not.

The press and other news media of this country have been derelict in the performance of their duty, in not letting the American people know—all 200 million of them—what is in this bill. We read a little article that was written about it. It is referred to as a simple civil rights bill. That is all they say. The Senator and I know it is not simple when a new Federal criminal code is sought to be created for the Nation, based on vague and indefinite terms and theoretical ideas, when we have no law, no tradition, no history, no legal foundation for them.

Instead of making the law and the bill and the act apply to every American citizen—all 200 million of them—it just applies to some citizens, sometimes, in cases, in some situations, when the religion is different, when the race is different, and when the national origin is different. That is what this bill is all about.

Mr. LONG of Louisiana. Mr. President, we have had violations of one's civil rights about which the people of this Nation are concerned. So far as I can see, the people of this Nation would not be helped by this bill one way or the other.

I should like to relate to the Senator a situation that occurred in my hometown. After Stokely Carmichael got through making his speeches advocating sedition, that the people rise up against their Government—treason and sedition—those seeds fell in some soil where they sprouted. In most instances, people ignored them. However, in two instances they took effect, with the result that some Negro citizens threw brickbats at cars moving on the interstate highway. In one situation, they would stand on a street corner and throw brickbats, rocks, and stones at automobiles that passed. Eventually, a boy was passing by on a motorcycle, and someone hit him in the head with a rock and killed him. Those people ran away.

The point is that that kind of mischief, stirred up by the Browns and Carmichaels, was responsible for the boy being killed.

Is that not the kind of situation about which the American people want something done?

Mr. TALMADGE. It is. But that would not be covered in this bill, unless they happened to be of a different race, a different religion, or a different national origin. Nothing in the bill affects a riot. They can riot on the streets as much as they wish, and this bill would not deter them in any way.

The floor manager of the bill, the distinguished Senator from Michigan, so stated. He made a statement and inserted it in the RECORD 2 days ago, if my memory serves me correctly.

Mr. LONG of Louisiana. May I suggest to the Senator that we should agree to amendments as a substitute for this bill, so that, in terms of civil rights, we could pass a bill, if one must be passed, which would help to make every person more secure in his home and more safe from assault from the outside, would make every mother safe in her functions and her duties toward her children, would make every father secure with his family, in seeking to provide them with the necessities of life, and would make every American, regardless of race, creed, or color, completely secure in the rights he is entitled to enjoy, against the troublemakers, agitators, and arsonists who would kill people and burn their homes down and destroy their places of business.

Mr. TALMADGE. I agree with the Senator. They incite the riots and create the enormous crime wave going on in the country at the present time.

Mr. LONG of Louisiana. Mr. President, it might be well if the Senator continued his speech at a later date; and if the Senator would agree to this, I would move that the Senate stand in adjournment at this time, under the previous order.

Mr. TALMADGE. I am willing to yield at this time.

## ADJOURNMENT

Mr. LONG of Louisiana. Mr. President, I move, in accordance with the order previously entered, that the Senate stand in adjournment until 12 o'clock meridian tomorrow.

The motion was agreed to; and (at 5 o'clock and 9 minutes p.m.) the Senate